360 So.2d 745 (1977)
Louis J. TSAVARIS, Relator,
v.
The Honorable Charles H. SCRUGGS, III, As Circuit Judge of the Thirteenth Judicial Circuit of the State of Florida, Respondent.
No. 48637.
Supreme Court of Florida.
March 17, 1977.
Rehearing Denied July 10, 1978.
*746 Raymond E. LaPorte and Henry Gonzalez, Tampa, for relator.
Robert L. Shevin, Atty. Gen., and Richard W. Prospect, Asst. Atty. Gen., for respondent.
HATCHETT, Justice.
This is an original proceeding on suggestion for writ of prohibition, which raises questions under the immunity statute, Section 914.04, Florida Statutes (1975).[1] Dr. *747 Tsavaris, who has been indicted for the first degree murder of Cassandra Ann Burton, sought dismissal of the indictment in the trial court. The motion to dismiss proceeded on the theory that Dr. Tsavaris was immune from prosecution because Jean Jones, one of his employees, had complied with certain subpoenas duces tecum. The trial judge, respondent in these proceedings, denied the motion to dismiss the indictment, and Dr. Tsavaris filed here.
Prohibition is an appropriate procedure, in these circumstances, as both parties concede. In a leading case, the District Court of Appeal, Third District, outlined procedures for raising the issue of immunity:
[T]he appropriate remedy ... would be to challenge the jurisdiction of the ... court to proceed by claiming immunity, and then, if that court proceeded, to seek relief by writ of prohibition in the appropriate court, that is, in the court having appellate jurisdiction... . Where a case is pending in the criminal court against a person claiming immunity ... it would be the duty of the criminal court involved to give effect to such immunity if it existed. Should the criminal court in such a case refuse to recognize the immunity the further action of that court in prosecuting the cause would amount to an excess of jurisdiction which then would be subject to restraint by prohibition. State ex rel. Reynolds v. Newell, Fla. 1958, 102 So.2d 613, 615; State ex rel. Byer v. Willard, Fla. 1951, 54 So.2d 179; State ex rel. Marshall v. Petteway, 121 Fla. 822, 164 So. 872.

Buchanan v. State ex rel. Husk, 167 So.2d 38, 40 (Fla. 3d DCA 1964).
The question whether Dr. Tsavaris is immune from prosecution for murder may also be stated as the question whether the circuit court has jurisdiction to try him.
The Constitution confers on this Court jurisdiction to "issue writs of prohibition to courts and commissions in causes within the jurisdiction of the supreme court to review." Florida Constitution, Art. V, § 3(b)(4). Inasmuch as Dr. Tsavaris is charged with a capital offense, we have concluded that he has properly invoked our jurisdiction,[2] and we have issued a rule nisi in prohibition, to which respondent has made return. We now decide that Dr. Tsavaris is not entitled to immunity from prosecution and discharge the rule.
On April 19, 1975, a man identifying himself as Dr. Tsavaris summoned ambulances to the apartment of Cassandra Ann Burton.[3] When they arrived, ambulance personnel found Dr. Tsavaris in the apartment *748 with Miss Burton's corpse. Dr. Tsavaris suggested an overdose of drugs as the cause of death, and emphasized that the only relationship which had existed between himself and the dead woman was that of psychiatrist and patient. The next day, however, a friend of Miss Burton told a sheriff's deputy that Miss Burton and Dr. Tsavaris had been having an affair; that she had become pregnant; and that she had undergone an abortion only four weeks earlier. According to the deputy's informant, Miss Burton had not wanted the abortion, but Dr. Tsavaris insisted; the couple's relationship was a stormy one, and they had recently quarreled over Miss Burton's demand that Tsavaris obtain a divorce in order to marry her.
While the autopsy was in progress, Dr. Tsavaris called the morgue to inquire about the results of the autopsy and reiterated his claim that he only knew the deceased professionally. He was told to call back later. When Dr. Tsavaris called the second time, he was told that the autopsy was not complete but that the pathologist had concluded that an abortion had recently been performed. He denied having any knowledge of an abortion. By the time a third telephone call came from Dr. Tsavaris, the medical examiners had satisfied themselves that Miss Burton's death was caused by strangulation. This was kept from Dr. Tsavaris, however, who was told instead that the official report might be inconclusive because no cause of death had been discovered. At this point, the person at the other end of the line said, he "could tell the change in Tsavaris' voice. I could sense the relief."
The following day, investigators spoke to a secretary in Dr. Tsavaris' office. When the investigators requested certain information, including the names of patients attending a group therapy session on the night of April 19, 1975, the secretary declined to answer on the ground of professional ethics. This development was reported to the state attorney's office. An assistant state attorney caused subpoenas to issue, among which were two subpoenas duces tecum, each addressed to the "Custodian of Records, 4600 Habana, Suite # 28, Tampa, Fla. (Office of Dr. Louis Tsavaris)." One directed the custodian to produce "the personal appointment book of Dr. Tsavaris for month of April, 1975," and the other commanded the production of "all medical records relating to Cassandra aka Sally Burton, aka Sandra Burton." Dr. Tsavaris' secretary, Jean Jones, complied with the subpoenas.[4]
She produced Dr. Tsavaris' appointment book, consisting of lined pages on which each line corresponds to a specified 15 minute interval of a working day. On some lines are written individuals' names and on some lines the word "Group" is written. Nothing in the record suggests that these handwritten entries were made by Dr. Tsavaris himself.[5] Miss Burton's medical records consist of a typewritten psychological evaluation, prepared by a clinical psychologist. In a cover letter, the psychologist thanks Dr. Tsavaris for referring Miss Burton to him. On a separate sheet, two typewritten paragraphs describe bruises and other effects of an automobile accident in which Miss Burton is said to have been involved on January 8, 1975. The record contains no clue as to authorship, apart from the idiosyncratic style of the writer, e.g., "[s]he looses [sic] her balance upon flexing her head." Written on Dr. Tsavaris' stationery, for "Sally Burton," is a prescription for Dilantin dated October 13, 1974. Several Connecticut General Life Insurance Company forms purport to have been signed by "Cassandra Ann Burton" and one of the company's forms, styled "Attending Physician's Statement" has Dr. Tsavaris' name typed in the signature *749 block. There is also a typewritten statement for services rendered and, finally, Miss Burton's name, address, telephone number, age, and date of birth have been written by hand on a piece of paper. Dr. Tsavaris contends that his secretary's production of these documents precludes his being brought to trial, on account of Section 914.04, Florida Statutes (1975).
In construing Section 914.04, Florida Statutes (1975), it is important to bear in mind "the very purpose for its enactment ... [is] to aid the state in the prosecution of crimes." State v. Schell, 222 So.2d 757, 758 (Fla. 2d DCA 1969). Immunity statutes are mechanisms for securing witnesses' self-incriminating testimony in the prosecution of third parties.
[T]he state may elect to immunize one offender from prosecution in order to secure the conviction of another, and this statute should be liberally construed to accomplish that purpose. State ex rel. Reynolds v. Newell, Fla. 1958, 102 So.2d 613; State ex rel. Johnson v. MacMillan, Fla.App. 1967, 194 So.2d 627; Lewis v. State, Fla.App. 1963, 155 So.2d 841; State v. Schell, supra at 758.
The wisdom of investing the prosecutor with authority to confer immunity is clear. The need for an immunity statute is a corollary to the privilege against self-incrimination, guaranteed by both the Florida and federal constitutions.[6] Equipped with his statutory powers, the prosecutor can loosen lips the Constitution would otherwise permit to remain sealed. Where a witness' testimony is crucial, prosecution of a third party accused could be stymied without the immunity statute even though the witness' testimony would only tend to incriminate the witness of some trivial offense. Similarly, in a case where the only evidence against the witness is unconvincing, the immunity statute enables the prosecution to use the witness' self-incriminating testimony in order to convict a third party, without forfeiting any realistic chance of securing the witness' conviction for his own offense.
However simple in theory, in application the immunity statute requires hard judgments on close questions. Before taking the unretraceable step of immunizing a putative offender, the prosecutor must develop information from all other available sources and carefully weigh probabilities. In Florida, the state attorney may subpoena witnesses to appear for questioning either before the grand jury, or, pursuant to Section 27.04, Florida Statutes (1975), before the state attorney himself. In this connection, the District Court of Appeal, Second District, said of a predecessor to Section 914.04, Florida Statutes (1975):
The gravamen of the statute is to provide an investigatory weapon to law enforcement which they are not obligated to utilize. In this case, the prosecution chose not to use it... .
The mere fact that the defendant was under subpoena to appear is immaterial. Compulsory attendance is one thing and compulsory testimony is quite another. State ex rel. Foster v. Hall, 230 So.2d 722, 723 (Fla. 2d DCA 1970).
The prosecutor in the present case called Dr. Tsavaris as a witness before the grand jury.[7] When Dr. Tsavaris invoked the *750 *751 Fifth Amendment, the authorities stopped questioning him rather than requiring him to answer. The prosecution elected not to confer immunity and refrained from further questions on that account. Dr. Tsavaris' grand jury appearance did not operate to immunize him from prosecution, State ex rel. Hemmings v. Coleman, 137 Fla. 80, 187 So. 793 (1938); Orosz v. State, 334 So.2d 26 (Fla. 1st DCA 1976); State ex rel. Foster v. Hall, supra. Contra, State v. Chapman, 240 So.2d 491 (Fla. 3d DCA 1970), and he does not argue otherwise.
Instead Dr. Tsavaris contends that the authorities inadvertently immunized him from prosecution earlier when his secretary complied with the subpoenas duces tecum.[8] Very little is to be said for a rule under which the doctor's susceptibility to prosecution is made to turn on anything his secretary does or does not do. The language of the immunity statute betrays no intention to empower an employee to secure its benefits for an employer. The statute says that "no person shall be prosecuted ... for ... any ... matter ... concerning which he may ... produce evidence." Section 914.04, Florida Statutes (1975) (emphasis supplied). We believe the plain language of the statute should be given effect and decide that no citizen can be immunized from prosecution for crime under Section 914.04 by another citizen's compliance with a subpoena. Because Dr. Tsavaris produced no evidence and gave no testimony, we hold that the statute confers no immunity.
In so holding, we reject certain premises underlying the decision in State ex rel. Byer v. Willard, 54 So.2d 179 (Fla. 1951). Byer's books and records were seized from an office pursuant to search warrant. Although the Court's opinion is silent as to whether Byer was present at the time of the seizure, the opinion asks, "[I]s not the seizure under search warrant of a man's private papers ... the equivalent of compelling such person to produce private papers . . ?" 54 So.2d at 182. Holding that the warranted seizure of his papers immunized the defendant from prosecution, the Court answered its rhetorical question affirmatively. To the extent the decision in State ex rel. Byer v. Willard, supra, rested on federal constitutional grounds, however, last year's decision in Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), would require a contrary result today. At Andresen's trial, documents, the authorities had seized from his law office, pursuant to a search warrant, were introduced in evidence against him. He argued unsuccessfully that his conviction should be overturned on the ground that the use of such evidence violated both the fourth and the fifth amendments.
In disposing of the fifth amendment claim, Mr. Justice Blackmun, writing for a seven man majority, said:

*752 [Andresen] was not asked to say or to do anything. The records seized contained statements that petitioner had voluntarily committed to writing. The search for and seizure of these records were conducted by law enforcement personnel... .
This case thus falls within the principle stated by Mr. Justice Holmes: "A party is privileged from producing the evidence but not from its production." Johnson v. United States, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913). This principle recognizes that the protection afforded by the self-incrimination clause of the Fifth Amendment "adheres basically to the person, not to information that may incriminate him." Couch v. United States, 409 U.S., [322] at 328, 93 S.Ct. [611] at 616 [, 34 L.Ed.2d 548.]. Thus, although the Fifth Amendment may protect an individual from complying with a subpoena for the production of his personal records in his possession because the very act of production may constitute a compulsory authentication of incriminating information, see Fisher v. United States, supra, a seizure of the same materials by law enforcement officers differs in a crucial respect  the individual against whom the search is directed is not required to aid in the discovery, production, or authentication of incriminating evidence.
427 U.S. at 473, 96 S.Ct. at 2745.
Since in the present case, too, Dr. Tsavaris "was not asked to say or to do anything," federal law presents no obstacle to his prosecution. Neither do we find anything in the Florida Constitution which would immunize Dr. Tsavaris from prosecution. The Legislature has seen fit to immunize a narrow class of persons from criminal prosecution for their acts in contravention of the common good. The Legislature has determined that only those who appear before the grand jury or the state attorney and produce information that is deemed of greater value to the community than the prosecution of the witness should reap the benefits of our immunity statute. There is nothing in Article I of our Constitution, the federal constitution, or in any statute, that compels us to insulate those suspected of criminal acts from vigorous investigation and prosecution.
The dissents suggest that our decision is a retreat from a "higher standard of protection." Protection for whom? They call for a rule which would allow one suspected of criminal activity to transfer incriminating evidence to a stranger or co-conspirator and thereby place such evidence beyond the reach of law enforcement officers, even when the law enforcement officers are armed with legal process meeting the tests prescribed by the state and federal constitutions. Not only would the dissents hold the evidence inadmissible at trial, but they would also exonerate one suspected of criminal activity of all accountability for his acts and prohibit trial, without regard for the quantity or compelling nature of other incriminating evidence lawfully in the possession of the prosecutor. Time has shown the error of such fallacious reasoning.
Our decision today does not limit the protections afforded by the Fourth or Fifth Amendments to the United States Constitution or Article I, Sections 9 or 12 of the Florida Constitution. We simply refrain from extending immunity, as a remedy, beyond its statutory boundaries.
No motion to suppress was filed below, and review of an order on any such motion would not be appropriate at this stage of the proceedings in any event. We therefore leave open, and expressly refrain from intimating any view on, the questions whether the materials from Dr. Tsavaris' office should be suppressed on account of the Fourth Amendment, as made applicable in state prosecutions by Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); on account of Article I, Section 9, of the Florida Constitution; or on account of Article I, Section 12, of the Florida Constitution.
The rule nisi in prohibition heretofore issued is now discharged, and the suggestion for writ of prohibition is denied.
OVERTON, C.J. and BOYD, J., concur.
*753 SUNDBERG, J., concurs specially with an opinion.
ENGLAND, J., dissents with an opinion, with which ADKINS and ROBERTS (retired), JJ., concur.
ADKINS, J., dissents with an opinion, with which ROBERTS (retired), J., concurs.
SUNDBERG, Justice, specially concurring.
It is often said that hard cases make bad law. In the instant case the deeply held views of various members of the Court seem to be leading us not necessarily to bad law, but to a failure to have a meeting of the minds on what I perceive to be the only issue in this case, i.e., do the provisions of Section 914.04, Florida Statutes, come into play so as to grant relator total immunity from prosecution? The dissents strongly and sincerely assert relator's protection against self-incrimination guaranteed by Article I, Section 9 of the Florida Constitution and the Fifth Amendment to the United States Constitution. In advocating his point, Mr. Justice Adkins asserts that the majority shifts with the winds which blow off the Potomac. He quite correctly maintains that the majority opinion overrules by implication State ex rel. Byer v. Willard, 54 So.2d 179 (Fla. 1951), and State v. Dawson, 290 So.2d 79 (Fla. 1st DCA 1974). We also become enmeshed in the question of whether documents authored by the defendant or under his direction and control enjoy the privilege against self-incrimination.
I feel compelled to attempt to cut through all of the flowing conceptionalizations announced in the several opinions to discuss what I conceive to be the narrow issue decided in this case. I do not read the majority opinion to deny Dr. Tsavaris his right to protection against self-incrimination. Nor do I perceive that the opinion, by citing Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), commits this Court to acceptance of a principle which characterizes documents as "testimonial" or "non-testimonial." Regardless of their character, there is evidence in the record now before us that the documents were unlawfully obtained by the State, and, therefore, it is possible that neither those documents nor information ascertained or developed from those documents may be used in any prosecution of Dr. Tsavaris. The reasons against such use are eloquently articulated by Justices Adkins and England. A ruling by the trial court upon an appropriately drawn motion to suppress may very well sound a death knell for any prosecution of Dr. Tsavaris, but so be it. The Constitution of the State of Florida and of the United States afford that protection of Dr. Tsavaris if the documents were improperly seized.
However, there is no analysis by which I can join the dissenters in their leap from Dr. Tsavaris's right to have illegally seized documentary evidence and its fruits suppressed to the conclusion that total immunity has been invoked through operation of Section 914.04, Florida Statutes. I concede that such is the rule of Willard and Dawson, supra, but these cases relied on the authority of Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921) which condemned the admission of papers in evidence that had been illegally seized by stating:
... In practice the result is the same to one accused of crime, whether he be obliged to supply evidence against himself or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers. In either case he is the unwilling source of the evidence, and the Fifth Amendment forbids that he shall be compelled to be a witness against himself in a criminal case.
It is readily apparent that the Gouled decision, under circumstances strikingly similar to those at hand, concluded that Fifth Amendment rights were to be vindicated through suppression of the documents which were obtained by search warrant, but in violation of the Fourth Amendment. I suggest, therefore, that this Court in Willard misapplied Gouled in utilizing it as authority for application of the then existing immunity statute. This error was perpetuated *754 in Dawson. I do not feel compelled to perpetuate further the error in analysis which I believe occurred in Willard.
In short, the law enforcement authorities in the instant case may have unwittingly victimized Dr. Tsavaris for which he has recourse under an appropriate motion to suppress; but surely the authorities have not immunized Dr. Tsavaris through operation of Section 914.04, Florida Statutes. To hold otherwise is not to vindicate a great constitutional principle but rather to make a game of the criminal justice system akin to a Turkish puzzle ring.
ENGLAND, Justice, dissenting.
I respectfully dissent. While I can generally accept the majority's analysis of the current state of federal law,[1] I cannot accept its retreat from the higher standard of constitutional protection which has been developed in our jurisprudence under Florida's Constitution. Until today it was well settled that Article I, Section 9 of the Florida Constitution extends to documents and records belonging to the accused, as well as to oral testimony. State ex rel. Byer v. Willard, 54 So.2d 179 (Fla. 1951). Moreover, it has been immaterial to the question of immunity that the documents at issue were obtained from a professional's employees so long as they were relevant to a confidential and professional (in this case doctor-patient) relationship.[2]State v. Dawson, 290 So.2d 79 (Fla. 1st DCA 1974). I would not scrap these constitutional safeguards, for reasons best articulated by former Justice Drew:
"It is the use of the power of the sovereign through its courts to compel or seize evidence against an accused over his objection that the framers of our constitution sought to protect. The wisdom of this is forcefully demonstrated by current events. A great and abiding duty rests on those vested with sovereign powers to scrupulously follow the law which they are trusted to enforce. Nothing less should be tolerated, and none know better what the law does require."[3]
Transactional immunity under our statute is appropriate in this case.[4] I recognize that the consequence of conferring immunity in this case would provide some court critics with another argument against a criminal justice system which appears overly solicitous to criminals.[5] On the surface it *755 appears that I would prevent an alleged murderer[6] from ever standing trial, due to some technical breach of rules by the police and prosecutors.
To cast my view of the Constitution in that light, however, is to scorn a system of justice which for 200 years has been geared to protect any citizen from criminal prosecution based on documents and testimony extracted from him by force. It is essential to remember that by enacting Section 914.04 the Legislature granted state attorneys an awesome authority to pry into private documents and to compel sworn testimony. The right to resist coerced incrimination reflects our most noble aspirations concerning the proper balance of governmental power and the inviolability of human rights.[7]
While this precious freedom can be abridged by any state attorney or his assistant who chooses to compel testimony or the production of documents, the Legislature has extracted a high price from government, namely an immunization from prosecution for the person so compelled to respond to subpoena. For these reasons, the immunity conferred by Section 914.04 should be liberally construed to extend to the full breadth of at least Article I, Section 9 of the Florida Constitution,[8] even if not required by the Fifth Amendment to the United States Constitution. Where this constitutional right is withdrawn by the unthinking issuance of a subpoena, the courts must stand ready to provide the concomitant freedom from prosecution.
ADKINS and ROBERTS (retired), JJ., concur.
ADKINS, Justice, dissenting.
I concur in the dissenting opinion of Justice England.
One of the responsibilities of this Court is to maintain stability in the case law of Florida, so that the citizens of our State will not have their rights or privileges varied from time to time as the philosophy of the individuals constituting the Court may change. We cannot presume that each citizen, including law enforcement officials, knows the law when this Court is prone to recede from or overrule prior decisions.
The rule against self-incrimination is the result of a long struggle between the opposing forces of the spirit of individual liberty on the one hand and the collective power of the state on the other. The fundamental thesis of the privilege against self-incrimination is that you cannot extract evidence from one charged with a crime on which to convict him. It is contrary to every principle of legal philosophy to coerce one to reveal his guilt.
There is a great distinction between self-incrimination by the use of private papers or other articles which merely furnish evidence of a crime and the search and seizure of the actual instrumentality of the crime. See Annotations, 129 A.L.R. 1297.
The majority opinion construes Article I, Section 9, Florida Constitution, and Section 914.04, Florida Statutes (1975), as being inapplicable, because Dr. Tsavaris produced no evidence and gave no testimony.
The majority view is anchored to Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2745, 49 L.Ed.2d 627, which involved an attorney charged with committing a state crime of false pretenses. After probable cause was *756 found, a search warrant was issued for the purpose of seizing private records and papers which were, in fact, instrumentalities of the crime. The defendant objected to their admissibility at the trial invoking his privilege against self-incrimination. No statute similar to Section 914.04, Florida Statutes, was involved. Under our construction of the Florida Constitution, this evidence would not be admissible, even though the search and seizure may have been lawful.
In State v. Kircheis, 269 So.2d 16 (Fla. 3d DCA 1972), a defendant was arrested on a homicide charge. The arrest took place near a motel where defendant was staying. After being jailed defendant requested that his briefcase be brought to him. In complying with this request, an officer opened and searched the briefcase, finding therein a paper bearing a handwritten notation that the defendant killed the victim. Defendant was charged with manslaughter and moved to suppress the evidence represented by his written statement, contending that it was obtained by an unlawful search and seizure. The appellate court held that the trial court correctly suppressed the "testimonial" or "communicative" statement, saying:
"With the search being lawful for the reasons stated, and therefore not violative of the fourth amendment, relevant evidence found therein would not be subject to be suppressed. Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782. An exception thereto is that evidence so seized which is `testimonial' or `communicative' in nature, the introduction of which would amount to compelling the defendant to become a witness against himself, is subject to be suppressed because in violation of the fifth amendment." At 17.
I assume this principle has now been abandoned, solely because the majority feel bound to construe the state constitution in the same manner as the United States Court construes the federal constitution.
We are not bound to follow a decision of the United States Supreme Court in construing the constitution of our State if we more adequately safeguard the individual rights and liberties of our citizens. See 20 Am.Jur.2d Courts § 225, at 556; State v. Barquet, 262 So.2d 431 (Fla. 1972).
The majority decision, as explained by Justice England in his dissent, overrules by implication State ex rel. Byer v. Willard, 54 So.2d 179 (Fla. 1951), and State v. Dawson, 290 So.2d 79 (Fla. 1st DCA 1974). Confusion will exist when we compare this decision with our previous statements in many cases.
Boynton v. State, 75 So.2d 211 (Fla. 1954), contains the following:
"The protection against self-incrimination guaranteed by the Declaration of Rights is applicable to any evidence, documentary or oral, that tends to convict one of crime or subject him to penalty or forfeiture; whether the prosecution, penalty or forfeiture involves a civil or criminal act is not material." (Emphasis supplied.) At 213.
Imparato v. Spicola, 238 So.2d 503 (Fla. 2d DCA 1970), was a certiorari proceeding to review an order denying a defendant's motion to quash subpoenas duces tecum returnable before the state attorney. The subpoenas called for compulsory production of every book, paper, document and record of two corporations. The court held that the subpoenas were too broad to satisfy the constitutional provisions protecting against unreasonable searches and seizures, and Fifth Amendment and state constitutional provision respecting guarantee against compulsory self-incrimination.
In Olsen v. State, 287 So.2d 313 (Fla. 1973), this Court, speaking through Justice Ervin, said:
"Fair and equal treatment of citizens requires that owners and operators of business establishments be accorded the full protection of the Fourth and Fifth Amendments to the United States Constitution against harrassment [sic] and intrusion of government agents and self-incrimination from their own papers and effects, except in those exceptional situations where the public welfare demands different treatment for them and only *757 then when the exceptions are made plainly to appear in the governing statutes." (Emphasis supplied.) At 315.
In Holmes v. State, 311 So.2d 780 (Fla. 3d DCA 1975), the court said:
"The constitutional privilege against self-incrimination relates to protecting an accused from the process of extracting from his own lips against his will an admission of guilt. Parkin v. State, Fla. 1970, 238 So.2d 817. This protection against self-incrimination is applicable to any evidence, documentary or oral, that tends to convict one of a crime or subject him to penalty or forfeiture; whether the prosecution, penalty or forfeiture involves a civil or criminal act is not material." (Emphasis supplied.) At 781.
These principles have now been discarded on the basis that the Supreme Court of the United States has placed a different construction on the federal constitution. However, there is still another reason why the circumstances of this particular case warrant immunization of Dr. Tsavaris.
Ordinarily, a person called before a grand jury by the state attorney would not be entitled to immunity just because he appeared in answer to a subpoena. However, in the case under consideration, the investigation had focused entirely upon Dr. Tsavaris. A subpoena duces tecum had been served upon his secretary and the prosecuting officials had been given an opportunity to examine his personal records.
When the grand jury was assembled, the primary purpose was to determine whether or not the evidence showed such probable cause as to authorize the return of an indictment. With full knowledge that the investigation had been focused upon Dr. Tsavaris, the prosecuting officials subpoenaed him to testify before the grand jury, allowed him to appear before the grand jury, and, in the presence of the grand jury, forced him to invoke his privilege against self-incrimination. It has been held that calling a defendant to the stand during his trial and requiring him to invoke his privilege against self-incrimination works irreparable prejudice. Kaplow v. State, 157 So.2d 862 (Fla. 2d DCA 1963).
For example, in San Fratello v. United States, 340 F.2d 560 (CCA 5th 1965), calling defendant's spouse as a witness during the trial for the purpose of forcing a claim of marital privilege against testifying was held to be prejudicial and reversible error.
The majority opinion holds that the grand jury appearance of Dr. Tsavaris did not operate to immunize him from prosecution. In support of this, the case of State ex rel. Hemmings v. Coleman, 137 Fla. 80, 187 So. 793 (1938), is cited. In this case the accused testified voluntarily and waived his privilege, thereby subjecting him to a prosecution for perjury committed during his grand jury appearance. Orosz v. State, 334 So.2d 26 (Fla. 1st DCA 1976), involved a situation where the defendant appeared before the state attorney in answer to a subpoena and, accompanied by counsel, voluntarily testified concerning a charge being brought against another. In State ex rel. Foster v. Hall, 230 So.2d 722 (Fla. 2d DCA 1970), the subpoenaed defendant voluntarily testified. None of those cases have any bearing on the issue confronting us.
The case sub judice involves an entirely different proposition. Dr. Tsavaris appeared in compliance with the subpoena. He was interrogated by the state attorney. The state attorney informed him that the grand jury was making an inquiry concerning the death of Cassandra Burton. Under the circumstances of this case, the silence, or refusal to testify, was testimonial in character. Jones on Evidence, 6th Ed., § 6:29, p. 59, contains the following:
"The principle is frequently applied in criminal cases that where accusations by the victim are made in the presence of the accused under such circumstances as naturally to call for a denial, and the accused remains silent and fails to deny such accusations, such silence amounts to a tacit admission of guilt."
Also, Jones on Evidence, Id., § 6:30, p. 61, contains the following:
"[T]he immunity from self-incrimination contemplates protection from compelled *758 conduct that is testimonial in character as well as spoken words."
In Jones v. State, 200 So.2d 574 (Fla. 3d DCA 1967), the court held that the introduction by the state, without objection, of testimony that the accused, while in custody, remained silent in the face of an accusation of guilt of the crime for which he was arrested and charged, constituted reversible error. Quoting from Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court said:
"No distinction can be drawn between statements which are direct confessions and statements which amount to `admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination."
In view of the fact that the investigation was focused upon Dr. Tsavaris and the state attorney knew or should have known that he would invoke his privilege against self-incrimination, the interrogation of Dr. Tsavaris during the grand jury proceeding was such as to require him to invoke his privilege. His silence or refusal to testify concerning the death of Cassandra Burton was of such testimonial character as to bring the provision of Section 914.04, Florida Statutes, into play and grant him immunity.
ROBERTS (retired), J., concurs.
On consideration of the petition for rehearing filed by relator,
IT IS ORDERED by the Court that said petition be and the same is hereby denied.
ENGLAND, C.J., and BOYD, OVERTON, SUNDBERG and HATCHETT, JJ., concur.
ADKINS, J., dissents with an opinion.
ADKINS, Judge, dissenting.
At the request of the author, this decision has been delayed on rehearing until the court determines whether evidence of the silence of accused after being informed of his Miranda rights constitutes such a violation of his fundamental rights as to constitute error even in the absence of objections.
Some decisions of the District Courts of Appeal have answered this question, "Yes, it is fundamental error:"

Farese v. State, 328 So.2d 548 (Fla. 1st DCA 1976)

Lucas v. State, 335 So.2d 566 (Fla. 1st DCA 1976)

Weiss v. State, 341 So.2d 528 (Fla. 3rd DCA 1977)

Davis v. State, 342 So.2d 987 (Fla. 3rd DCA 1977)

Smith v. State, 342 So.2d 990 (Fla. 3rd DCA 1977)

Acee v. State, 330 So.2d 496 (Fla. 4th DCA 1976), Cert. denied, Fla., 339 So.2d 1172

Martin v. State, 334 So.2d 841 (Fla. 4th DCA 1976)

Boyd v. State, 335 So.2d 834 (Fla. 4th DCA 1976)

Williams v. State, 335 So.2d 854 (Fla. 4th DCA 1976)

Carter v. State, 335 So.2d 875 (Fla. 4th DCA 1976)

Collins v. State, 340 So.2d 516 (Fla. 4th DCA 1976)

Woulard v. State, 340 So.2d 945 (Fla. 4th DCA 1976)

Spann v. State, 340 So.2d 1215 (Fla. 4th DCA 1977)

Maness v. State, 341 So.2d 246 (Fla. 4th DCA 1977)

Webb v. State, 347 So.2d 1054 (Fla. 4th DCA 1977)

Boyd v. State, 351 So.2d 1041 (Fla. 4th DCA 1976)

Pinkney v. State, 351 So.2d 1047 (Fla. 4th DCA 1977)

Paulen v. State, 352 So.2d 1205 (Fla. 4th DCA 1977)

Bostic v. State, 332 So.2d 349 (Fla. 4th DCA 1976)
Some decisions of the District Courts of Appeal have answered this question, "No."

Nevels v. State, 351 So.2d 762 (Fla. 1st DCA 1977)

*759 Clark v. State, 336 So.2d 468 (Fla. 2nd DCA 1976)

Greenfield v. State, 337 So.2d 1021 (Fla. 2nd DCA 1976)

Mansfield v. State, 338 So.2d 857 (Fla. 3rd DCA 1976), Cert. dismissed Fla., 342 So.2d 1102

Cridland v. State, 338 So.2d 30 (Fla. 3rd DCA 1976)

Farmer v. State, 326 So.2d 32 (Fla. 4th DCA 1976), Cert. dismissed, Fla., 340 So.2d 927

Sylvester v. State, 341 So.2d 203 (Fla. 4th DCA 1977)
Many of these decisions are pending before us, and we must eventually resolve this conflict. Any question relating to the basic rights and liberty of a person becomes an important, and often controversial, problem in any case as we weigh these rights with the rights and security of the general public. So it is that we have not yet answered the question. I hoped to anchor my views in the case sub judice to the decisions in the other cases. The delay resulted.
In my opinion we should answer the question in the affirmative which conforms with the reasoning in Bennett v. State, 316 So.2d 41 (Fla. 1975), and Willinsky v. State, 360 So.2d 760 (Case No. 49-330  opinion filed April 5, 1978).
A comment before a trial jury on a defendant's silence is fundamental error. As we said before, it is asking too much of jurors to expect them to draw no adverse inferences, even when so instructed, from a defendant's silence in the face of an accusation. And, a case is often likely to stand or fall on such an improper inference. Objection at trial is not necessary to preserve an appeal on the ground of an improper comment of the kind discussed here.
I now turn to the majority opinion, where reference is made to the fallacious reasoning of the dissents. I conclude from the opinion that the subpoena duces tecum served upon Dr. Tsavaris' secretary should be treated as a search warrant, but the majority opinion hints that the search was illegal.
This, of course, connotes lack of probable cause at the time the office of Tsavaris was invaded and his records seized.
The majority opinion recites sufficient facts to show that the investigation focused upon Tsavaris at the time he was subpoenaed to appear before the grand jury and was interrogated. Although it could be said that this was not a custodial interrogation as contemplated by Miranda, nevertheless, it was a compulsory attendance by the prime suspect. In the presence of the grand jury (during an inquiry as to probable cause) the prime suspect was given his Miranda warnings, but elected to remain silent and invoke his rights under the Fifth Amendment. He had to assert that "the answer to the question might tend to incriminate me."
Just as this would constitute fundamental error at trial requiring reversal of a conviction even in the absence of an objection, so it is that the questioning of Tsavaris contaminated the grand jury finding of probable cause to such an extent that the indictment should be dismissed even if no objection was made on this ground.
Our primary difference on the application of the immunity statute as expressed by Justice Sundberg is whether we should invoke the immunity doctrine and free Tsavaris from investigation or suggest that he assert his right to be free from an unlawful search and seizure. The majority intimates that the search and seizure was unlawful, but sends the question to the trial judge and state attorney for determination.
The primary responsibility of the judiciary is to safeguard the rights and liberty of each citizen, even though in doing so the image or popularity of the judiciary may suffer. Various rights acquire varying degrees of importance as we carefully adjust the scales so that the rights of the accused and the rights of the public are balanced. This weighing process in the administration of "justice" is stabilized by the use of "precedent". A decision cannot be "unjust" as long as it is founded upon established principles. It may become "unjust" when established precedent is ignored. In carrying *760 out this responsibility, I would "bite the bullet" and grant immunity. It is a violation of fundamental fairness to thrust this responsibility upon the lower tribunal when some of us feel immunity should be granted and a majority of the court indicates that the prosecution cannot use any of the fruit plucked from the tree of the illegal search.
To solve this problem we should order that the indictment be dismissed so that another grand jury could be impaneled and the question of probable cause determined without the use of evidence gained by an illegal search and without the presumptions flowing from Tsavaris' decision to exercise his rights under the Fifth Amendment. This would be the true administration of justice. To do otherwise makes special law for special cases and creates uncertainty in the law.
There is ample precedent for this procedure. The annotation, "Self-Incrimination Before Grand Jury" contains the following, 38 A.L.R.2d 225 at 238:
"... there is a group of cases in which the view has been taken that where a grand jury investigation is directed against a particular person in such a way that, as to it, he stands in the status of a defendant in an ordinary criminal trial, then his constitutional privilege has the effect of preventing his being called to take the witness stand at all. (It should be noted that in most of the cases of this type the courts have invalidated indictments against a defendant who was forced to appear before a grand jury under such circumstances.)
"Illinois.  Boone v. People (1894) 148 Ill. 440, 36 N.E. 99, infra, Section 29.
"Minnesota.  State v. Froiseth (1871) 16 Minn. 296, Gil. 260, infra, Section 29, State v. Gardner, (1902) 88 Minn. 130, 92 N.W. 529, infra, Section 29.
"Missouri.  State v. Faulkner (1903) 175 Mo. 546, 75 S.W. 116, infra, Section 29.
"New York.  People v. Bermel (1911) 71 Misc. 356, 128 N.Y.S. 524, infra, Section 29; People v. Luckman, (1937) 164 Misc. 230, 297 N.Y.S. 616, affd in part and revd in part on other matters 254 App. Div. 694, 3 N.Y.S.2d 864, infra, Section 29.
"Pennsylvania.  Commonwealth v. Gross, (1952) 172 Pa.Super. 85, 92 A.2d 251, infra, Section 19(c); Commonwealth v. Bane, (1940) 39 Pa. D. & C. 664, 3 Fayette Leg.J. 291, infra, Section 29."
I would grant the petition for rehearing.
NOTES
[1] This section provides:

No person, having been duly served with a subpoena or subpoena duces tecum, shall be excused from attending and testifying or producing any book, paper, or other document before any court having felony trial jurisdiction, grand jury, or State Attorney, upon investigation, proceeding, or trial for a violation of any of the criminal statutes of this state upon the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to convict him of a crime or to subject him to a penalty or forfeiture, but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence, documentary or otherwise, and no testimony so given or produced shall be received against him upon any criminal investigation or proceeding.
[2] We need not now decide whether the District Court of Appeal might also be a proper forum in an appropriate case of this kind. See generally State ex rel. Kovnot v. Ferguson, 313 So.2d 710 (Fla. 1975); State ex rel. Brewer v. Pettie, 294 So.2d 120 (Fla. 4th DCA 1974); State ex rel. Sentinel Star Co. v. Lambeth, 192 So.2d 518 (Fla. 4th DCA 1966). In any event, "once a petitioner seeks relief in a particular court by means of a petition for extraordinary writ . . he has picked his forum. He is not entitled to a second or third opportunity for the same relief by the same writ in a different court." Jenkins v. Wainwright, 322 So.2d 477 (Fla. 1975).
[3] Although there has been no trial, certain facts appear from the transcript of the hearing on the motion to dismiss and from depositions filed in the trial court.
[4] At the same time she also produced other papers for reasons which are not clear. In our view of the case, the contents of these papers are immaterial.
[5] We need not decide whether any of the subpoenaed materials are "testimonial" in character. See post, pp. 751-752; Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). For purposes of decision, we assume that they are incriminating. See State ex rel. Reynolds v. Newell, 102 So.2d 613 (Fla. 1958).
[6] Immunity statutes are designed to insulate the witness against the incriminating effect of testimony the State compels him to give. As a federal constitutional matter, it is only necessary that the witness be given use immunity. Zicarelli v. New Jersey State Com'n of Investigation, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Under Section 914.04, Florida Statutes (1975), the prosecutor, by requiring a subpoenaed witness to testify over objection on self-incrimination grounds, confers transactional immunity as to the matter about which he inquires and use immunity as to other offenses. State ex rel. Hough v. Popper, Fla., 287 So.2d 282, reh. den. 287 So.2d 321 (Fla. 1974). Whether, in such circumstances, this broader grant of immunity is required by Art. I, § 9, Florida Constitution, is an open question.
[7] Dr. Tsavaris' appearance was transcribed and has been included in the record:

MR. SALCINES: This is Dr. Louis Tsavaris, who has been subpoenaed to appear before you. As we had indicated to you earlier, based on our discussions with his attorney, Mr. Larry Byrd, who is standing right outside the door.
Doctor, should you, at any time, wish to consult with your attorney you may do that.
As we have discussed with Mr. Byrd earlier, whether there was need to subpoena Dr. Tsavaris, and he had indicated that he would bring him up voluntarily, and then the Doctor announced, with his attorney that he would not appear without a subpoena, and pursuant to that, I have just subpoenaed and served Dr. Tsavaris, and Dr. Tsavaris is appearing here, for the purposes of the record, under subpoena by the Hillsborough County Grand Jury.
* * * * * *
BY MR. SALCINES:
Q I know you to be Louis J. Tsavaris, M.D., and a practicing physician who has been qualified as a psychiatrist in the Courts of the Thirteenth Judicial Circuit. Is that your true name?
A Yes, it is.
Q And you are represented by Larry Byrd, an attorney licensed to practice in the State of Florida?
A That is correct.
Q And, Doctor, as you know, this Grand Jury is investigating the circumstances of the death of one Cassandra Burton, and it is my duty, as the Legal Advisor to this Hillsborough County Grand Jury, to advise you of your constitutional rights prior to any questioning whatsoever by anyone in this room, either the Special Prosecutor's Office, or that of the Grand Jurors, and your rights are as follows:
You have the right to remain silent. Do you understand that, Doctor?
A Yes, I do.
Q Anything that you would say or can say will be used against you in a court of law. Do you understand that?
A Yes, I do.
Q And that you have a right to be represented by an attorney, and to have him present outside of the Grand Jury Room to confer with before you answer any questions put to you by either myself, as a Legal Advisor to the Hillsborough County Grand Jury, my Assistants, or the Members of the Grand Jury. Do you understand that, Doctor?
A Yes, I do.
Q And if you cannot afford an attorney, one will be appointed for you, without charge to you, before any questioning. Do you understand that, Doctor?
A Yes, I do.
Q And you are represented by Larry Byrd, who is present today, right outside the Grand Jury Room; is he not?
A Yes, that is correct.
Q At any time that you wish you can exercise any of these foregoing rights; that is, any particular question that you do not wish to answer, you can so state. Any question that is asked that you wish to consult with your attorney, the interrogation would stop immediately, and we will give you a reasonable time to confer with your attorney. Do you understand that, Doctor?
A Yes, I do.
Q And, certainly, no one has promised you anything to induce you to appear before this Hillsborough County Grand Jury; is that correct, Doctor?
A Yes, that is correct, yes.
Q Doctor, is it your desire to answer the Grand Jury's questions concerning the investigation that they are now in the process of conducting?
A Would you repeat the question?
Q Is it your intent to answer any questions relating to the investigation that this Hillsborough County Grand Jury is conducting, namely, the death of one Cassandra Burton; is it your intent to answer any questions that the Grand Jury might have concerning that investigation?
A My lawyer has advised me that I should not, and under the Fifth Amendment, the answer to the question, it may tend to incriminate me.
Q Is it your intent to plead the Fifth Amendment, as you have indicated there, that it might be incriminating, any questions to you as a professional, that is, you are a medical physician, and in your response in a professional capacity to Miss Cassandra Burton, do you intend to claim the Fifth?
A I'm not here under a professional capacity. The answer to that would be the same.
Q The answer would be the same?
A (Witness nods affirmatively.)
Q And then, would your answer be the same if we inquired either into the circumstances of your knowing Cassandra Burton, or what occurred the night of her death?
A Yes, the answer would be the same.
Q And the answer would be what; would you please read it for the record?
A I respectfully decline to answer the questions on the grounds that my lawyer has advised me under the Fifth Amendment, the answer to the question might tend to incriminate me, and I apologize very much to the Grand Jury.
MR. SALCINES: Mr. Foreman, it would appear that any questions we would ask of this witness, he would follow his attorney's instructions, and he would refuse to answer on the grounds that anything he might say would be used against him. I see no further reason to keep Dr. Tsavaris, then, unless there is something further that we should inquire into.
THE FOREMAN: No questions.
MR. SALCINES: Thank you, Doctor. (Thereupon, the examination was concluded.)
[8] He relies principally on the decision of the District Court of Appeal, First District, in State v. Dawson, 290 So.2d 79 (Fla. 1st DCA 1974). The subpoenas duces tecum in State v. Dawson, supra, issued to employees of a lawyer who was accused of grand larceny, among other things. The subpoenas directed the employees to produce specified cancelled checks, doctor's bills, and the law office's accounting records. "Each employee, under protest, delivered the documents and records to the grand jury." 290 So.2d at 81. The trial judge dismissed the criminal charges against Dawson. In affirming the dismissal, the District Court of Appeal cited Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), for the proposition that Dawson's records and the cancelled checks enjoyed fifth amendment protection, and went on to say that "there is no difference whatever in compelling a man to be a witness against himself and in seizing his records to be used against him." 290 So.2d 82-83. Recent decisions by the United States Supreme Court make clear, however, that there are important differences between compelling testimony and compelling the production of documents in the hands of third parties. At the same time, these cases have seriously undercut the precedential force of Boyd v. United States, supra. E.g., Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) ("Several of Boyd's express or implicit declarations have not stood the test of time... ." 425 U.S. at 407, 96 S.Ct. at 1579. "It would appear that ... the precise claim sustained in Boyd would now be rejected... ." 425 U.S. at 408, 96 S.Ct. at 1579.
[1] Despite the majority's characterizations, it is my view that private papers are still privileged under the United States Constitution when their compelled production inherently requires the defendant to vouch for their existence, his possession or their authenticity. Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Under the federal constitution the business papers of a sole proprietor or sole practitioner are considered to be private papers. Bellis v. United States, 417 U.S. 85, 87-88, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974). Documents of this sort are to be distinguished from handwriting exemplars, blood samples, and other identification evidence which does not involve a disclosure of private affairs in a testimonial context. Fisher v. United States, 425 U.S. 391, 407, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39, 54 (1976).
[2] There is no dispute as to the fact that Dr. Tsavaris' records obtained in this case, including his appointment book for April and Miss Burton's medical records, meet this professional nexus test.
[3] State v. Dawson, 290 So.2d 79, 83 (Fla. 1st DCA 1974).
[4] I reject the state's assertions that immunity is unavailable either because the state elected not to use the evidence seized or because the evidence in this case did not directly tend to incriminate Dr. Tsavaris. See State ex rel. Reynolds v. Newell, 102 So.2d 613, 615-16 (Fla. 1958).
[5] This criticism is magnified here, of course, because no prior case under our immunity statute involved a crime as serious as murder. Prior to 1969 the predecessor immunity statute applied only to investigations into violations of statutes "against bribery, burglary, larceny, gaming or gambling, or ... the illegal sale of spiritous, vinous or malt liquors." Section 932.29, Fla. Stat. (1967). A witness appearing before a grand jury investigating the crime of murder could not thereby gain automatic immunity from prosecution. State v. Grech, 219 So.2d 96 (Fla. 3d DCA 1969). Chapter 69-316, Laws of Florida, was enacted to expand the investigatory abilities of law enforcement officials by extending the power to coerce testimony and cooperation to all areas of criminal activity. Since that time the few cases involving Section 914.04 which have reached the appellate courts have concerned offenses of lesser magnitude than murder. See, State v. Dawson, 290 So.2d 79 (Fla. 1st DCA 1974) (grand larceny); Lurie v. State Bd. of Dentistry, 288 So.2d 223 (Fla. 1973) (receiving and aiding the concealment of stolen goods); State ex rel. Hough v. Popper, 287 So.2d 282 (Fla. 1973) (conspiracy and bribery); Gilliam v. State, 267 So.2d 658 (Fla. 2d DCA 1972) (deceptive business practices).
[6] It is still the rule of law in this state that persons charged with a crime are presumed innocent. There is no present basis on which to conclude that Dr. Tsavaris caused the death of Cassandra Burton.
[7] Murphy v. Waterfront Comm'n, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).
[8] Lurie v. State Bd. of Dentistry, 288 So.2d 223 (Fla. 1973); State v. Chapman, 240 So.2d 491 (Fla. 3d DCA 1970); State v. Schell, 222 So.2d 757 (Fla. 2d DCA 1969); Lewis v. State, 155 So.2d 841 (Fla. 2d DCA 1963).